UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DORIS EDWARDS,<br><br>    Plaintiff,<br><br> vs.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>    Defendant. | 5:17-CV-05092-KES<br><br><br>MEMORANDUM OPINION AND<br>ORDER AFFIRMING THE DECISION<br>OF THE COMMISSIONER |

Plaintiff, Doris Edwards, seeks review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits (SSDI) under Title II of the Social Security Act, 42 U.S.C. § 423. Docket 17. The Commissioner opposes the motion and urges the court to affirm the denial of benefits. Docket 18. For the following reasons, the court affirms the decision of the Commissioner.

## PROCEDURAL HISTORY

Edwards filed for SSDI benefits on July 29, 2014, alleging disability since April 3, 2010. AR 91, 285. The Commissioner denied her claim initially on January 22, 2015, and upon reconsideration on April 22, 2015. AR 117-21, 126-32. Edwards then appeared with counsel before Administrative Law Judge (ALJ) Michele M. Kelley on January 10, 2017. *See* AR 30 (transcript of hearing). The ALJ issued an opinion affirming the denial of benefits on April 5, 2017. AR

11-23. The Appeals Council denied Edwards's request for review on November 14, 2017. AR 1-4. Thus, Edwards's appeal of the Commissioner's final decision is properly before the court under 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Plaintiff, Doris Edwards, was born on July 5, 1960. AR 40. Edwards is a military veteran and divorced. AR 577, 612. At the time of the hearing, Edwards was living with a female roommate named Alice. AR 47. Edwards and Alice have lived together "on and off" since 1999. AR 52. Between the onset date and the date last insured, Edwards lived with Alice. AR 49-50. During the relevant time period, Alice assisted Edwards with several activities like dressing, showering, and caring for Edwards's emotional support dog. AR 47, 52-53, 621-22.

Before the onset date, Edwards had the following health issues: hearing loss, sleep apnea, obesity, shoulder injury, osteoarthrosis of the leg and knee, dysthymia, knee injury, ovarian cancer, depression, and asthma. AR 652 (emergency department problem list from April of 2009). To address the sleep apnea issue, Edwards used a sleep apnea machine. AR 622. Edwards's shoulder injury stemmed from an injury during her time in the military. AR 462, 577. Edwards has a history of multiple orthopedic surgeries. AR 576-77. Edwards has been cancer free since 2005. AR 462. Additionally, on February 24, 2010, Edwards was diagnosed with plantar fasciitis. AR 573-74.

In July of 2009, Edwards was diagnosed with fibromyalgia. AR 357-58. Edwards was prescribed medication to treat this condition. AR 588. On March

18, 2010, Edwards complained her fibromyalgia was "still bothersome." AR 577. Dr. Margaret Becker, Edwards's primary care physician, assessed Edwards's fibromyalgia as "not well controlled." AR 560. At her next primary care appointment with Dr. Becker on June 14, 2010, Edwards complained her fibromyalgia was "acting up." AR 546. At this time, Dr. Becker changed her prescription. AR 549. On November 26, 2010, Edwards's MRI scans showed mild degenerative disc changes but no significant canal or foraminal stenosis. AR 666. At a neurology consultation with Dr. Laurie A. Weisensee on April 6, 2011, Edwards's lumbar spine magnetic resonance imaging was unremarkable. AR 463. Dr. Weisensee stated she did not find any neurologic concerns. *Id.*

Edwards also has chronic pain in her knees, hips, and lower back. On June 2, 2010, both of Edwards's knees were x-rayed. AR 670-73. All three compartments of her knees demonstrated osteoarthritic changes. AR 671, 673. At an orthopedic consultation with Dr. Curtis Hartman on September 3, 2010, Edwards complained of longstanding bilateral knee pain, numbness in her legs, and falling on a regular basis. AR 359. Dr. Hartman stated the x-rays showed "significant arthritic changes" in the knee, mild to moderate. AR 360. Also, he worried that the majority of the pain was related to Edwards's back and lumbar spine. *Id.*

At a primary care appointment with Dr. Becker on September 22, 2010, Edwards had tenderness throughout her back muscles and spine. AR 510. Dr. Becker stated Edwards's hip films from a year ago were "unremarkable." *Id.* On October 4, 2010, Edwards's lumbar spine film showed there was no fracture or

malalignment. AR 667. Additionally, she had unremarkable bilateral hip films. AR 668-70. On November 26, 2010, Edwards's lumbar spine film showed no significant canal or foraminal stenoses, but did show mild degenerative disc changes and mild facet acropathy. AR 664-66.

On April 6, 2011, at Edwards's neurology consultation with Dr. Weisensee, Edwards complained of chronic pain in her bilateral knees and back. AR 462. Dr. Weisensee opined there were degenerative findings in Edwards's knees; she also noted that Edwards's hip films were unremarkable. AR 463. At her primary care appointment on September 19, 2011, Dr. Becker noted Edwards had lower back tenderness, knee pain, and used crutches. AR 446. Edwards's radiology films from September 22, 2011, showed Edwards had osteoarthritis and mild degenerative joint disease in her knees. AR 662. Edwards did not have another primary care appointment with Dr. Becker for the next two years. AR 384, 416.

In addition to her physical health issues, Edwards received treatment for her mental health. Edwards was diagnosed with depression, which her mental health providers, Dr. Shirley Herbel and Dr. Thomas J. Jewitt, classified as a chronic condition. AR 466, 551. Edwards had mental health counseling sessions with Dr. Herbel, a psychologist at the Veterans Affairs Black Hills Fort Meade Campus, to address her symptoms of depression/dysthymia. AR 641. These sessions occurred between every three to four weeks (AR 641) or between every four to six weeks (AR 585) depending on Edwards's depression and symptoms. In the record, Dr. Herbel's treatment notes for Edwards start

around May of 2009. AR 641. During the relevant time period, Edwards met with Dr. Herbel twenty-three times. AR 390, 391, 393, 402, 404, 421, 425, 429, 431, 434, 436, 440, 455, 456, 460, 464, 481, 495, 504, 518, 538, 551, 552.

Additionally, Edwards met with Dr. Jewitt, a physician at the VA Black Hills Fort Meade Campus, for her mental health medication checkups. AR 640. Dr. Jewitt specialized in psychiatry. AR 68-71. In the record, Dr. Jewitt's treatment notes start around June of 2009. AR 639-40. Dr. Jewitt generally met with Edwards twice a year. AR 846. During the relevant time period, Edwards met with Dr. Jewitt six times. AR 417, 459, 466, 505, 553, 554.

For the current claim, Edwards's onset date is April 3, 2010. AR 11, 285. Her date last insured status expired on December 31, 2012. AR 33. Edwards's original onset date was September 16, 2006. AR 285. But Edwards's first social security claim covered the time of her original onset date to April 1, 2010 (the date her first claim's decision was issued). AR 11. Edwards previously filed a social security claim in 2015 but was denied based on her receipt of Veterans Affairs benefits. AR 33. Her VA benefits decreased in amount in January of 2016. AR 33. The decrease in VA benefits allowed her to be eligible for social security disability insurance benefits. *Id.*

## ADMINISTRATIVE HEARING

During the administrative hearing, the ALJ heard testimony from Edwards and a vocational expert. Edwards, represented by counsel at the hearing, testified about the pain she had during the relevant time period.

Edwards stated she experienced a constant sharp pain from "the top of [her] head to the tip of [her] toes." AR 40. She testified that her doctors told her the pain was caused by fibromyalgia and prescribed her medication. AR 40.

Edwards also testified about the constant pain in her right shoulder and both of her knees. AR 41. Edwards testified she had complete knee replacements of both her knees the year before the hearing (outside of the relevant time period). AR 50. Edwards stated that even after her knee replacements she still used a cane to walk because of her fear of falling. AR 51. She testified that she still had a lot of pain in her knees, but it was "a little less" than before the replacements. AR 51. She also mentioned she had surgery on her left shoulder. AR 50.

Edwards testified about how her pain affects her daily activities. AR 43-44. She stated she can only sit and stand for ten-minute increments and can only walk for five minutes. AR 43. She said her ability to lift is also restricted by the limited use of her right arm. AR 44. Her pain only allows her to sleep for two-hour increments. AR 46. Her day consisted of waking up, taking care of her dog, her roommate making her breakfast, sitting on the couch to watch TV, and taking a nap. *Id.* Edwards testified that she can only sit for a short period of time before she has to get up, move around, and then can sit down again. *Id.* She also testified that she needed help from her roommate to take a shower and get dressed. AR 47. Edwards also testified about caring for her dog. AR 46. Edwards stated she owned a Jack Russel terrier as an emotional support dog during the relevant time period. AR 47, 52.

Additionally, Edwards testified about her use of assistive devices. AR 41-42. She stated that during the relevant time period, she used crutches (held by her hands) that were prescribed by her doctor. AR 41. She testified that she was prescribed the crutches because her knees were damaged and she could not stand up on her own or she would fall. AR 42. Also, during the relevant time, she was prescribed a wheeled walker. *Id.* She used the walker to assist in walking and to sit for rest when she was outside on level ground. *Id.*

Edwards also testified about various trips she took during the relevant time period. AR 47-49. Edwards took two road trips, one to California and one to Texas. *Id.* The purposes of the trips were to visit family. AR 47. During these trips, Edwards's roommate or sister drove, and they took several stops to eat, rest, and for Edwards to move around. *Id.*

Edwards also testified about her depression. AR 45. Edwards stated that her depression was severe. *Id.* She explained how her depression made her feel useless and that she attempted suicide. *Id.* She testified that she was prescribed medication that helped with her depression. *Id.*

William Tisdale served as the vocational expert at the hearing. AR 54. The ALJ posed two hypotheticals. AR 56-57, 60-61. For the first hypothetical, the ALJ asked whether an individual with the similar past work history, age, and educational background as Edwards, who could stand and walk for two hours, sit for six hours, with additional lifting and moving limitations, could perform any of Edwards's past jobs. AR 56-57. The vocational expert stated that such an individual could work as a night auditor, a billing clerk, and a

cashier. AR 57-59. For the second hypothetical, the individual was the same as the first but was off task two hours per work day. AR 60-61. The vocational expert testified that the individual could not perform any of Edwards's past work or be a billing clerk. AR 61. Edwards's attorney also asked about a hypothetical situation to the vocational expert. *Id.* Edwards's attorney asked what jobs were available for an individual who could sit and stand for ten minutes at a time and only walk for five minutes. *Id.* The vocational expert stated that the individual could not perform any job. AR 62.

## ALJ DECISION

Employing the five-step analysis associated with an application for social security benefits, the ALJ denied Edwards's claim on April 5, 2017. AR 23. At step one, the ALJ found that Edwards had not engaged in substantial gainful activity from her alleged onset date, September 16, 2006, through her date last insured, December 31, 2012. AR 13. At step two, the ALJ determined Edwards had the following severe impairments: osteoarthritis of the knees, degenerative disc disease, asthma, plantar fasciitis bilaterally, and obesity. AR 13.

At step three, the ALJ concluded Edwards did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 15. At step four, the ALJ found Edwards had the residual functional capacity (RFC) to perform sedentary work with some limitations.[1] AR 17, 21. At step five, the

---

[1] The ALJ found Edwards could lift, carry, push and pull ten pounds occasionally and less than ten pounds frequently; could stand and walk for two hours in an eight hour workday; could sit for about six hours in an eight hour

ALJ found, through the date last insured, Edwards was capable of performing past relevant work as a night auditor, medication aide, and cashier. AR 21. The ALJ held that based on Edwards's age, education, work experience, and RFC, through the date last insured, Edwards was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. AR 23. Thus, the ALJ concluded that Edwards was not disabled under the Social Security Act. *Id.*

## STANDARD OF REVIEW

The court must uphold the ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). " 'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the conclusion.' " *Teague*, 638 F.3d at 614 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). When reviewing the record, "the court 'must consider both evidence that supports and evidence that detracts from the Commissioner's decision.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting

---

workday; could occasionally climb ramps and stairs, as well as balance and crouch; could frequently stoop; could occasionally reach from her shoulders to the front and laterally and overhead beyond shoulder level; and could still reach hinging at the elbows forward. AR 17. The ALJ found Edwards could not climb ladders, ropes, or scaffolds; could not kneel or crawl; needed to avoid concentrated exposure to temperature extremes, humidity, and hazards; needed to avoid even moderate exposure to fumes, odors, dust, gases, and poor ventilation. *Id.*

*Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007)). If the Commissioner's decision is supported by substantial evidence in the record as a whole, the court may not reverse it merely because substantial evidence also exists in the record that would support a contrary position or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## THE FIVE STEP PROCEDURE FOR DISABILITY DETERMINATIONS

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(3)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national

economy[.]" 42 U.S.C. § 423(d)(2)(A). An ALJ must apply a five-step procedure when determining if an applicant is disabled. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993). The steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b); 20 C.F.R. § 416.920(b).

**Step Two**: Determine whether the applicant has an impairment or a combination of impairments that are severe. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c).

**Step Three**: Determine whether any of the severe impairments identified in Step Two match the listing in Appendix 1. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 416.920(d).

**Step Four**: Considering the applicant's RFC, determine whether the applicant can perform any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 416.920(g).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy that the applicant can perform. 20 C.F.R. § 404.1520(f); 20 C.F.R. § 416.920(f).

## DISCUSSION

Edwards urges the court to review the ALJ's decision for the following reasons: (1) the ALJ failed to identify Edwards's psychological condition as a severe impairment; (2) the ALJ erred in rejecting part of the treating physician's opinion; and (3) the ALJ erred in rejecting Edwards's subjective complaints.

Docket 17. The court will address these arguments in the order of the five-step procedure outlined above.

## I. Step Two

At step two, the ALJ must determine whether Edwards has an impairment or a combination of impairments that are severe. 20 C.F.R. § 404.1520(c). An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1522 (2016). Edwards argues that the ALJ should have found Edwards's depression was a severe impairment because Dr. Jewitt's opinion and Edwards's mental health record show Edwards suffered from waxing and waning depression that had more than a "minimal effect" on her ability to work. Docket 17 at 35.

The ALJ found that Edwards had the severe impairments of osteoarthritis of the knees, degenerative disc disease, asthma, plantar fasciitis bilaterally, and obesity. AR 13. The ALJ concluded that Edwards did not have a mental health condition that was considered to be severe. AR 15. The ALJ discussed several of Edwards's mental health treatment records. AR 14-15. In addition to the medical records, the ALJ considered an opinion by Dr. Jewitt from 2017. AR 15. Dr. Jewitt opined that Edwards had marked limitations in some functioning. *Id.* (citing AR 847-49). The ALJ gave little weight to Dr. Jewitt's opinion contained in the Medical Source Statement form (AR 847-49). AR 15. Based on her review of the record, the ALJ concluded that the treatment notes indicated Edwards was not under significant mental health distress.

AR 15. Regarding Edwards's mental health disorder, the ALJ found that

Edwards had "mild difficulties in understanding, remembering, or applying

information; mild difficulties in interacting with others; mild difficulties in

maintain concentration, persistence, or pace; and mild difficulties adapting or

managing oneself." *Id.* Therefore, Edwards's depression did not meet the

standards in Appendix 1 and would not be classified as a severe impairment.

A. **Substantial evidence in the record supports the ALJ's finding
that Edwards had mild difficulties in her ability to do work
because of her mental health disorder.**

Edwards argues "the ALJ only picked out two notes where Edwards was

doing better with her depression, implying that Edwards was not having any

significant health issues." Docket 17 at 34. Edwards argues that the treatment

notes established Edwards suffered from waxing and waning depression

symptoms. *Id.* Edwards, however, cites to no treatment records. Instead,

Edwards only cites to a Medical Source Statement form completed by Dr.

Jewitt in 2017. *Id.* (citing AR 847). In this report, Dr. Jewitt never mentioned

the "waxing and waning" symptoms of Edwards's depression. *See* AR 847-49.

But he noted that her "[i]rritability is variable, but always present." AR 848.

Here, substantial evidence in the record supports the ALJ's finding that

Edwards's depression was not severe. The ALJ discussed several medical

records that demonstrated Edwards's mental condition was stable and had

minimal effect on her ability to do work. AR 14-15. For example, the ALJ

discussed a medical record from 2009 that indicated Edwards's dysthymia was

stable. AR 14. In this medical record from November of 2009, Dr. Herbel noted

Edwards had good eye contact, spontaneous speech, intact memory, no suicide ideation, no psychotic symptoms, and stable dysthymia. AR 596.

Also, the ALJ discussed a treatment note from October of 2010 where Dr. Jewitt noted that Edwards's mood appeared "pretty stable with a positive and pleasant affect." AR 14 (citing AR 505). Dr. Jewitt observed that even with "tough days," Edwards was "overall doing well." AR 505. The ALJ also relied on a treatment note by Dr. Herbel from October of 2012 that indicated Edwards had a minimal labile affect and intact memory. AR 14 (citing AR 437). At this appointment, Dr. Herbel noted Edwards was less dysphoric, had good eye contact, logical thinking, no psychotic symptoms, and stable dysthymia. AR 436-37.

And the ALJ considered evidence from Dr. Jewitt's June 2015 treatment notes, where Dr. Jewitt noted that Edwards was able to make her own decisions and was responsible for her own actions. AR 15 (citing AR 846). The ALJ looked at notes from Dr. Herbel from that same month. AR 15. Dr. Herbel stated that Edwards's diagnosis was stable dysthymia and dependent personality traits. AR 842. She noted Edwards's condition was chronic, yet stable. AR 841. The ALJ, in addition, looked at Dr. Herbel's treatment notes from August of 2016 that indicated Edwards had minimal labile affect, minimal tangential speech, good eye contact, stable dysthymia, and no hopelessness or suicidal ideation. AR 14-15 (citing AR 838-39). Additionally, the ALJ considered treatment notes from January of 2017 where Edwards reported having problems with her depression. AR 14 (citing AR 837). In the treatment notes,

Dr. Herbel noted that Edwards was in a dysthymic mood and that Edwards complained of memory issues and sadness. AR 837. But Dr. Herbel noted that Edwards condition was static, Edwards denied suicidal ideation and hopelessness, and had intact memory. *Id.*

Substantial evidence in the record shows that during the relevant time, Edwards's mental condition remained the same. At several appointments, Dr. Herbel noted Edwards's dysthymia was "stable." AR 390, 391, 393, 402, 405, 422, 426, 429, 432, 435, 437, 441, 456, 457, 460, 464, 482, 496, 504, 518, 538, 551, 552. Additionally, at all of her appointments with Dr. Herbel, Edwards arrived on time, had no psychotic symptoms nor suicidal thoughts, and had intact memory. AR 390, 391, 393, 402, 404-05, 422, 425-26, 429, 431, 434-35, 436-37, 440-41, 455-57, 460, 464, 481-82, 495-96, 504, 518-19, 538, 551, 552. Though Edwards's symptoms would change depending on her life situations, her overall mental condition did not vary too often. From February 2, 2012 to December 4, 2012, Edwards's symptoms and moods remained constant. AR 390, 391, 393, 402, 405, 422, 425, 429, 431. During that entire time period, Edwards had a euthymic mood and logical thinking. *Id.*

### B.    The ALJ properly discounted Dr. Jewitt's 2017 opinion.

A treating physician is a doctor with whom the patient "has, or has had, an ongoing treatment relationship[.]" 20 C.F.R. § 404.1502 (2016); 20 C.F.R. § 416.902 (2015). A treating physician's opinion should generally be given controlling weight if the opinion is "well-supported by medically acceptable" diagnostic techniques and is consistent "with the other substantial evidence in

the record." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Brown v. Barnhart,* 390 F.3d 535, 540 (8th Cir. 2004)). But a treating physician's opinion is not automatically controlling because the ALJ must evaluate the record as a whole. *Smith v. Colvin*, 756 F.3d 621, 627 (8th Cir. 2014); *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007). The ALJ can discredit or disregard the treating physician's opinion when the "opinion conflicts with other substantial medical evidence contained within the record" or when the treating physician's opinion is inconsistent and undermines the opinion's credibility. *Wagner*, 499 F.3d at 849 (citations omitted). The ALJ "may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Id.* (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir. 2000)).

The ALJ resolves conflicts between the various opinions and evaluation from treating and examining physicians. *Wagner*, 499 F.3d at 848. In determining what weight to give any medical opinion, the ALJ should consider the following factors: (1) examining relationship; (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and (6) "any factors [the applicant] or others bring[s] to [the ALJ's] attention." *Id.* (alteration in original) (quoting 20 C.F.R. § 404.1527(d)). The ALJ must provide "good reasons" for the weight given to the treating physician's opinion. *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (citation omitted). "This requires the ALJ to explain in his written decision, with some specificity, why he has

rejected the treating physician's opinion." *Walker v. Comm'r*, 911 F.3d 550, 553 (8th Cir. 2018) (citing *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)).

Edwards argues the ALJ erred in evaluating the opinion of Dr. Jewitt. Docket 17 at 36. The ALJ gave little weight to one of Dr. Jewitt's medical opinions from 2017. AR 15. Edwards claims that the ALJ did not provide "good reasons" for rejecting Dr. Jewitt's opinion and that the reasons for rejecting Dr. Jewitt's opinion are unsupported by the record. Docket 17 at 36.

The ALJ provided four reasons for the weight given to Dr. Jewitt's opinion. AR 15. First, the opinion, dated 2017, was more than four years after Edwards's last date insured. *Id.* Second, the medical evidence was inconsistent with Dr. Jewitt's opinion. *Id.* Third, Dr. Jewitt is not a mental health specialist. *Id.* Fourth, the opinion was influenced by the personal relationship and treatment history between Dr. Jewitt and Edwards. *Id.*

Edwards argues that the ALJ's two reasons "miss the mark." Docket 17 at 34. Edwards incorrectly states that the ALJ provided only two reasons for giving little weight to Dr. Jewitt's 2017 opinion. The ALJ provided four reasons for her weight determination. AR 15. Edwards only attacks two of the four reasons provided by the ALJ. First, Edwards contends that the ALJ's stated reason that the medical evidence was inconsistent with Jewitt's opinion is incorrect because the treatment notes show Edwards was under significant mental health distress. Docket 17 at 34. Second, Edwards argues the ALJ erred in her statement that Dr. Jewitt is not a mental health specialist. *Id.* The

court will address the two reasons Edwards attacks and then address the two other reasons provided by the ALJ.

### 1. Inconsistent with substantial evidence in the record.

Edwards contends the ALJ's reasoning, that Dr. Jewitt's opinion is inconsistent with the record, misses the mark because the treatment notes show that Edwards experienced significant mental health distress. Docket 17 at 34. As discussed above, the court found that substantial medical evidence in the record supported the ALJ's finding that Edwards was not under significant mental distress and that Edwards only had mild difficulties in her ability to do work related activities. Dr. Jewitt's opinion that Edwards had moderate and marked limitations is inconsistent with substantial evidence in the record for the reasons stated above. Because Dr. Jewitt's 2017 opinion is inconsistent with substantial evidence in the record, it is not entitled to controlling weight. *Wagner*, 499 F.3d at 849.

In addition to being inconsistent with other medical evidence in the record, the ALJ properly discounted Dr. Jewitt's 2017 opinion because it was inconsistent with Dr. Jewitt's own medical opinions rendered during the relevant period of time. In *Krogmeier v. Barnhart*, the Eighth Circuit found there was substantial evidence in the record to support the ALJ's decision to give little weight to a treating provider's opinion rendered after the relevant time period. 294 F.3d 1019, 1023 (8th Cir. 2002). During the onset date and the date last insured, the treating provider regularly noted that the claimant's depression was controlled and the claimant required a low-stress environment.

18

*Id.* After the relevant time period, the treating provider rendered an opinion that the claimant could not handle any stress or he would relapse into further depression. *Id.* The Eighth Circuit reasoned that the opinion did not deserve controlling weight because it was inconsistent with the treating source's contemporaneous treatment notes. *Id.*

Here, Dr. Jewitt's 2017 opinion is inconsistent with the opinions he rendered during the relevant period of time. In 2017, on the Medical Source Statement form, Dr. Jewitt opinioned that Edwards's mental health affected her ability to understand, remember, and carry out instructions. AR 847. Dr. Jewitt's contemporaneous notes in 2012 demonstrated that Edwards's thinking and judgment were not "marked." At Edwards's medication checkup on July 12, 2012, Dr. Jewitt wrote, "Thinking is clear and logical. Insight is partial, judgment is not great but neither is it seriously impaired." AR 417. Additionally, none of Dr. Jewitt's treatment notes made during the relevant time period discuss any of the capabilities he checked as "marked" on the Medical Source Statement. *See* AR 417, 459, 466, 505, 553, 554.

In his 2017 opinion, Dr. Jewitt noted that irritability is always present, but nowhere in his treatment notes during the relevant time period did he note this issue. *See* AR 417, 459, 466, 505, 553, 554. The first time Dr. Jewitt noted irritability was in June of 2015. AR 846. Dr. Jewitt commented, "While somewhat agitated and verbal, she is not out of control[.]" AR 846. This note was recorded past the last date insured. In February of 2016, Dr. Jewitt observed that Edwards was "a bit edgy." AR 845. Here, Edwards cannot use Dr.

Jewitt's opinions rendered after her last date insured to support her disability claim. "Medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence relates back to the claimant's limitations prior to the date last insured." *Scheets v. Astrue,* No. 09–3437–CV–S–REL–SSA, 2011 WL 144919, at *17 (W.D. Mo. Jan. 18, 2011). Additionally, Dr. Jewitt's notes after 2012 demonstrate that Dr. Jewitt's 2017 opinion likely relied on his most recent treatment notes and not his notes from the relevant time period.

The only contemporaneous note that supports Dr. Jewitt's 2017 opinion is an opinion from Dr. Jewitt on April 7, 2010. AR 554. At that appointment, Dr. Jewitt wrote, "I think she really is pretty disabled . . . ." *Id.* Additionally, he opined, "Seeking and maintain competitive employment is absolutely out of the question for her given the complexity of her physical and emotional problems." *Id.* Here, the ALJ did not need to give controlling weight to this opinion from 2010. *See Ellis v. Barnhart,* 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner . . . .").

Overall, the ALJ did not err in her reasoning that Dr. Jewitt's 2017 opinion is inconsistent with the medical evidence. The court finds that Dr. Jewitt's opinion was inconsistent with other substantial evidence in the record and inconsistent with his own contemporaneous treatment notes.

## 2.    Mental Health Specialist

Edwards argues that the ALJ erred when she found that Dr. Jewitt was not a mental health specialist. Docket 17 at 34. Generally, more weight is given to the medical opinion of a specialist about medical issues that relate to his area of specialty. 20 C.F.R. § 404.1527(c)(5); *see Wright v. Colvin*, 789 F.3d 847, 855 (8th Cir. 2015) (stating the ALJ "was within his purview not to give these observations [of depression] much weight because they were not from specialists in the mental health field.").

Edwards states that Dr. Jewitt is a specialist mental health provider because Dr. Jewitt is a psychiatrist. Docket 17 at 34. The record, however, is not clear on whether Dr. Jewitt had a specialty in mental health. On the Medical Source Statement, Dr. Jewitt failed to provide his specialty in the Medical Specialty blank; instead, he signed the form with his name and M.D. AR 849. In all of his treatment notes, he signed as "Thomas L. Jewitt, MD, Physician." AR 553. But there is some evidence that shows he worked within the psychiatry area. For example, the local title in all of his treatment notes states, "MHC – Psychiatry Clinician" and "Mental Health Physician Note." AR 417, 466, 505, 553, 554. The record was clarified when Edwards submitted evidence to the Appeals Council that Dr. Jewitt was appointed to Black Hills Health Care System in 1993 in the Mental Health Department with a specialty in Psychiatry. AR 68-73. Thus, substantial evidence in the record supports the fact that Dr. Jewitt is a mental health specialist provider.

Though the court rejects this reason provided by the ALJ, it does not mean that the ALJ's discounting of Dr. Jewitt's opinion was improper. The ALJ acknowledged Dr. Jewitt was one of Edwards's treating mental health providers. AR 15. Also, the Eighth Circuit has held that when a specialist's opinion is "controverted by substantial evidence or is otherwise discredited" the rule that entitles the specialist's opinion greater weight does not apply. *Prosch*, 201 F.3d at 1014. Thus, Dr. Jewitt's opinion is not entitled to greater weight, though he is a mental health specialist, because his opinion is contrary to other substantial medical evidence in the record as discussed above. Additionally, the other three reasons provided by the ALJ are supported by substantial evidence in the record.

### 3. Date of Opinion

The court will now address the two additional reasons provided by the ALJ. The ALJ gave less weight to Dr. Jewitt's opinion because it was rendered four years after Edwards's disability insured status expired. AR 15. The Eighth Circuit upheld an ALJ's decision to give less weight to a treating source's opinion, dated 2017, because it was rendered three years after the claimant's benefits expired. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.' " *Id.* at 877 (quoting *Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998)); *see, e.g., Eastvold v. Astrue*, 2010 WL 1286334, at *47 (D. Minn. Feb. 12, 2010) (finding that the ALJ properly rejected a medical report because it "was completed several years

after the date last insured" and "does not purport to relate back to the date last insured.").

Edwards's date last insured was December 31, 2012. AR 11. Dr. Jewitt completed the Medical Source Statement form on January 23, 2017. AR 849. Dr. Jewitt wrote on the form, "Please rate her capabilities for the time period April 2010 to December 31, 2012 and December 31, 2012 to present." AR 848. Nowhere on the form does Dr. Jewitt indicate which opinions apply to the two different time periods. *See* 847-49. The opinions in the form could pertain to Edwards's capabilities beyond the relevant time period. *See Bannister v. Astrue*, 730 F. Supp. 2d 946, 954 (S.D. Iowa 2010) (citing *Moore v. Astrue*, 572 F.3d 520, 525 (8th Cir. 2009) (upholding the ALJ's attribution of less weight to a medical opinion because it was not relevant to the time period prior to claimant's date last insured)). Thus, the ALJ properly discounted this opinion based on its timeliness.

### 4. Influenced by Personal Relationship

The final reason the ALJ gave was the opinion appeared to be influenced by the personal relationship and treatment history of Dr. Jewitt and Edwards. AR 15. In *Coggon v. Barnhart*, the district court held that it was reasonable for the ALJ to label one of the treating source's opinions as an "advocacy" opinion. 354 F. Supp. 2d 40, 53 (D. Mass. 2005). The court noted several facts that demonstrated a potential bias: (1) the treating source completed a questionnaire that was created by the claimant's attorneys; (2) the opinions in the questionnaire rendered the claimant bedridden; (3) the opinions were

inconsistent with other evidence in the record; and (4) the treating source stated the claimant was "disabled" and "unfortunately, her disability was denied." *Id.* The court held that all of this evidence demostrated a potential bias and predisposition on the treating source's part to advocate on the claimant's behalf. *Id.*

Here, the facts are similar to those in *Coggon*. Substantial evidence in the record indicates that the ALJ was reasonable in noting a potential bias existed. First, Dr. Jewitt's opinion in the Medical Source Statement essentially concluded that Edwards had severe mental health distress (AR 847-49), which was not consistent with substantial evidence in the record. Second, Dr. Jewitt stated Edwards was "disabled" and made comments about the status of Edwards's social security claim. For example, at an October 2009 medication checkup, Dr. Jewitt mentioned that Edwards's social security application was at the administrative judge level for the last year and suggested that Edwards call social security every few months for an update. AR 598. Again, at Edwards's April 7, 2010 medication checkup with Dr. Jewitt, Dr. Jewitt discussed Edwards's social security process and recommended she contact an attorney. AR 554. He noted that she was upset because her social security appeal was denied and reviewed with her how to find an attorney. *Id.* His conclusion that she was "pretty disabled" was preceded by his discussion of the social security denial and followed by his opinion that "the organized approach that the attorney will provide will be needed." *Id.* Thus, the ALJ did have a

basis to conclude that Dr. Jewitt had a potential bias and predisposition to advocate on Edwards's behalf.

### 5. Conclusory Opinion

In addition to the four reasons stated above, the ALJ properly discounted Dr. Jewitt's 2017 opinion because it was conclusory. A treating physician's opinion does not deserve greater weight than other physicians' opinions when the treating physician's opinion contains "nothing more than vague, conclusory statements." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quoting *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)). "[T]he checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value." *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001). Dr. Jewitt's completion of the Medical Source Statement (AR 847-50) was conclusory as he cited no medical evidence to back up his statements and provided no elaboration. *See Wildman*, 596 F.3d at 964 (upholding the ALJ's decision to discount a treating physician's opinion because it was conclusory, consisted of three checklist forms, cited no medical evidence, and provided no elaboration).

Here, Dr. Jewitt merely checked boxes to label Edwards's ability to perform work activities. AR 847-48. The first question asks whether Edwards's ability to understand, remember, and carry out instructions was affected by the impairment. AR 847. In the section of the form that is intended for the doctor to "identify the factors (e.g., the particular medical signs, laboratory findings, or other factors described above) that support your assessment," Dr.

Jewitt only wrote "medical history and examinations." *Id.* On the section to describe Edwards's ability to interact appropriately, Dr. Jewitt checked boxes but failed to provide a detailed explanation to support his conclusions. AR 848. Instead, Dr. Jewitt wrote, "Poor completion skills. Irritability is variable, but always present." *Id.* The factors he identified to support this assessment were "history and *many* medical/mental health visits." *Id.* (emphasis in original). The ALJ properly discounted this opinion because Dr. Jewitt failed to provide any specific findings, appointment dates, or any other information to support or explain why he checked certain boxes.

Overall, the ALJ properly discounted Dr. Jewitt's 2017 opinion. The ALJ provided three specific reasons that were supported by substantial evidence in the record. Plus, Dr. Jewitt's opinion was conclusory. Also, it should be noted that the ALJ did not disregard Dr. Jewitt's opinions in their entirety, she only gave his 2017 opinion little weight and relied on his other opinions throughout her discussion. AR 14-15; *see also Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007) (noting the ALJ did not reject all of the treating source's opinions). Thus, the court finds that the ALJ did not err in discounting Dr. Jewitt's 2017 opinion.

## II.     STEP FOUR

At step four, the Commissioner must determine the claimant's RFC, which is the most the claimant can do despite the claimant's mental and physical limitations. *Brown v. Barnhart*, 390 F.3d 535, 538-39 (8th Cir. 2004) (citing 20 C.F.R. § 404.1545(a)(1)). "The burden of persuasion to prove

disability and to demonstrate RFC remains on the claimant[.]" *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The claimant's RFC is determined based on all relevant evidence in the record, including medical records, observations of treating physicians, and the individual's own description of her limitations. *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006). But the ALJ's finding "must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). The ALJ's RFC evaluation must include a "narrative discussion" that cites specific medical and non-medical evidence and explains how the evidence supports his conclusions. SSR 96–8p, 1996 WL 374184 (July 2, 1996). Also, the ALJ must explain how any material inconsistencies or ambiguities in the record were considered and resolved. *Id.*

The ALJ determined Edwards had the residual functional capacity to do sedentary work with some limitations. AR 17. In determining Edwards's RFC, the ALJ considered Edwards's symptoms and whether they were consistent with the objective medical evidence, as well as the opinion evidence of several physicians. AR 17-21. Edwards argues that the ALJ should have issued a more restrictive RFC assessment that incorporated Edwards's subjective complaints of needing to change positions due to pain and her need to use assistive devices. Docket 17 at 37-38.

## A. Edwards's Subjective Complaints

"Symptoms such as pain are considered along with any impairments when determining a claimant's RFC." *Brown*, 390 F.3d at 541. In determining

whether to fully credit a claimant's subjective complaints, such as pain, the ALJ engages in a two–step process: (1) is there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *See* SSR 16-3p, 2016 WL 1020935 (Mar. 16, 2016); 20 C.F.R. § 404.1529.

In evaluating the second step of the analysis, an ALJ must consider several factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; (5) functional restrictions; (6) relevant work history; and (7) the lack of objective medical evidence to support the complaints. *Wildman*, 596 F.3d at 968 (citations omitted) (factors referred to as "*Polaski* factors"). A claimant's subjective complaints may be discredited only if they are inconsistent with the evidence as a whole. *Id.* The court will "defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so," *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (internal quotation omitted), though the ALJ does not need to explicitly discuss each of the factors above. *Wildman*, 596 F.3d at 968 (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).

Here, the ALJ found Edwards had a history of osteoarthritis of the knees, degenerative disc disease, asthma, plantar fasciitis bilaterally, and obesity that could reasonably be expected to produce her symptoms in accordance with the first step above. AR 18, 21. The ALJ found some of Edwards's subjective complaints to not be credible based on the ALJ's conclusion that Edwards's alleged functional restrictions were disproportionate to the clinical findings in the medical evidence of the record. AR 21.

Edwards contends that the ALJ erred in rejecting Edwards's "credibility concerning her need to change positions due to pain and her need to use crutches[.]" Docket 17 at 38. Edwards first alleges the ALJ never addressed or analyzed Edwards's use of a cane and walker or her need to change positions in the ALJ's decision. *Id.* In regard to the use of a cane and walker, Edwards's allegation is baseless. The ALJ addressed Edwards's use of a cane, walker, and crutches throughout her RFC determination. *See* AR 18-20. The ALJ discussed Edwards's hearing testimony where she stated she used crutches for ambulation and sometimes used a walker. AR 18. Additionally, the ALJ noted the use of assistive devices in various medical treatment notes. *See id.* (Edwards stated she used a cane for ambulation at a July 2009 appointment); AR 19 (Edwards used a cane for assistance at a February 2010 appointment and used crutches at a November 2010 appointment); AR 20 (Edwards used bilateral quad canes for assistance at September 2012 appointment). Thus, the court rejects Edwards's allegation that the ALJ never considered Edwards's use of assistive devices in her RFC determination.

In regard to Edwards's need to change positions, Edwards is correct. Nowhere in the ALJ's decision is Edwards's need to change position specifically mentioned or analyzed. The ALJ, however, discussed the symptom of pain throughout her RFC determination. *See* AR 18-21. For example, the ALJ discussed Edwards's diagnosis of fibromyalgia. AR 18 (finding Edwards's fibromyalgia was a non-severe condition). Edwards acknowledges that her need to change positions is due to pain. Docket 17 at 38-39. Pain is a symptom of fibromyalgia. Additionally, the ALJ analyzed Edwards's pain complaints contained in medical reports and hearing testimony in reference to her knees, hip, and back. AR 18-21. Also, the ALJ considered Edwards's daily activities which included Edwards's testimony that she moves around minimally during the day and spends much of her time on the couch because of her pain. AR 18 (referencing hearing testimony at AR 43 and 46). Thus, the court does not agree with Edwards's argument that the ALJ never addressed or analyzed Edwards's need to change position. The court views the ALJ's discussion of Edwards's general pain complaints to encompass her need to change positions.

Second, Edwards argues the ALJ did not provide any reasons or specific inconsistencies in the record to support her rejection of Edwards's complaints. Docket 17 at 38. Edwards argues the ALJ did not give "any reasons" for rejecting Edwards's need to use assistive devices. *Id.* But nowhere in the ALJ's decision does the ALJ state that she is rejecting Edwards's use of these devices in its entirety. The ALJ did not need to provide a reason for rejecting this subjective complaint if the ALJ, in fact, did not reject the complaint. As is

evident throughout the ALJ's RFC determination, the ALJ likely considered Edwards's use of the assistive devices because she mentioned them five times. AR 18-20. Additionally, the ALJ gave great weight to the consulting state agency doctors. AR 21. In his report, Dr. Erickson acknowledged Edwards's use of assistive devices and stated the such use would not affect Edwards's ability to perform sedentary work. AR 100. Thus, the ALJ's RFC determination, which is limited to sedentary work, included Edwards's use of assistive devices.

Edwards also argues the ALJ did not give "any reasons" why Edwards's testimony about her inability to sit, stand, or walk for more than ten minutes was rejected. Docket 17 at 38. But the ALJ did not disregard Edwards's complaints of pain in their entirety. The ALJ stated that some of Edwards's alleged functional restrictions were "disproportionate" to the medical evidence in the record. AR 21. The ALJ provided two reasons for discrediting some of Edwards's subjective complaints. AR 20. First, the ALJ stated the treatment notes, examination findings, and objective diagnostic testing results did not support Edward's alleged limitations. *Id.*; *see Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (upholding the ALJ's adverse credibility finding of the claimant based on the lack of additional evidence corroborating the claimant's subjective complaints).

This reasoning is one of the factors the ALJ can consider in assessing Edwards's complaint, i.e., the "absence of objective medical evidence to support the complaints." *Brown*, 390 F.3d at 541. Here, Edwards cannot point to any medical evidence that support's her subjective complaint that her pain was so

severe that she must change positions often. The only evidence in the record about this alleged limitation is Edwards's own testimony at the administrative hearing. AR 43.

Another factor the ALJ can consider is the duration, frequency, and intensity of the condition. *Brown*, 390 F.3d at 541. The evidence submitted by Edwards pertaining to her fibromyalgia pre-dated the relevant time period. AR 18. There are medical records that mention Edwards's complaints of fibromyalgia during the relevant time period. *See* AR 510, 546. But nowhere in the medical record does Edwards make the specific complaint — her pain causes her to change her position every ten minutes — to any treating provider. *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016) (holding a lack of complaints to a treating physician detracts from a claimant's allegations of a disabling impairment). For example, at an orthopedic consultation, Edwards complained of her legs "going numb" and falling on a regular basis, but failed to mention she needed to constantly change position due to pain. AR 359; *see also* AR 441-47 (primary care appointment with Dr. Becker where Edwards complained of other chronic pain symptoms but failed to mention her need to change positions). Also, Edwards met with Dr. Herbel for 45-50 minute counseling sessions, yet Dr. Herbel's notes never mentioned Edwards's need to get up and move around every ten minutes due to pain. *See* AR 390, 391, 393, 402, 404-05, 421-22, 425-26, 429, 431, 434-35, 436-37, 440-41, 455-46, 456-57, 460, 464, 481-82, 495-96, 504, 518-19, 538, 551, 552.

In contrast, substantial evidence in the record supports the ALJ's decision to not include this specific complaint related to pain. Dr. Erickson, a consulting physician, noted Edwards complained of "pain all over her body" yet was never able to quantify the problem to any of her providers. AR 99. Furthermore, he also noted that her neurology reports were "essentially normal" and her provider noted she "tends to hang on to pain and aches from injuries for quite a while." *Id.* (referencing AR 463, 648). Dr. Erickson's opinions are supported by other medical evidence in the record, which was discussed by the ALJ (AR 19-20). At Edwards's MRI scan on November 26, 2010, there was no significant canal or foraminal stenoses, though there were mild degenerative disc changes and facet acropachy. AR 666. Edwards was also fitted for a back support on November 3, 2010. AR 729. Edwards stated that she believed the back support would help with her back pain. *Id.* Edwards's neurology report from April 6, 2011, showed her lumbar spine MRI and hip films were "unremarkable." AR 463. The neurologist, Laurie A. Weisensee, opined that she did not find any neurologic concerns. *Id.*

In addition to those medical reports cited by the ALJ, there are other medical reports that support the ALJ's determination. For example, Edwards's radiology scans showed Edwards's lumbar spine was without fracture or malalignment and her bilateral hip scans were unremarkable. AR 667, 669-70. Overall, substantial evidence in the record supports the ALJ's decision to reject Edwards's complaint because of the lack of complaints to her treating providers and lack of other supporting medical evidence. The court will not reverse the

ALJ's decision based solely on Edwards's medically unsupported and inconsistent testimony that she must change positions due to pain.

Another reason provided by the ALJ was that there were "a number of inconsistencies" that detracted from Edwards's allegation that her condition was disabling. AR 20. Substantial evidence in the record supports the ALJ's position that there were inconsistencies regarding Edwards's need to change position due to pain. "[I]inconsistencies between subjective complaints of pain and daily living patterns may . . . diminish credibility." *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007) (alterations in original) (internal quotations omitted). Here, the ALJ considered some of the other *Polaski* factors in assessing Edwards's complaint. AR 18-21.

For example, the ALJ considered the functional restrictions. At the hearing, Edwards testified that she can only sit for a total of ten minutes before she must move. AR 43. Edwards's testimony is inconsistent with her two long-distance road trips to California and Texas (AR 47-49). At the hearing, the ALJ asked Edwards questions about her trips that allowed the ALJ to consider the *Polaski* factors. *Id.* The ALJ asked Edwards about the purposes of the trips, who drove, how many days the drives took, how many days she stayed at each destination, how often they stopped, why they stopped, and where they stayed. *Id.* Though Edwards testified that they took many stops during the road trip (AR 47, 49), it is unlikely that they stopped every ten minutes for Edwards to get up and move around. The ALJ could use this inconsistency in judging the credibility of Edwards's complaint.

Next, the ALJ considered Edwards's daily activities. AR 18. In assessing a claimant's daily activities, "the ALJ must consider the 'quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities.' " *Hendrickson v. Berryhill*, No. 4:17-CV-04173-VLD, 2018 WL 5984837, at *28 (D.S.D. Nov. 14, 2018) (quoting *Wagner*, 499 F.3d at 852)). The ALJ considered Edwards's use of assistive devices, how she got up and took care of her dog, her minimal movement during the day, and how much of her time consisted of sitting on the couch. AR 18. The ALJ considered Edwards's caring of her dog, which consisted of feeding, letting the dog out in the fenced yard, and picking up dog feces. AR 46, 52, 53. The ALJ permissibly could have found all of these activities to be inconsistent with Edwards's complaints. *See, e.g.*, *Ponder v. Colvin*, 770 F.3d 1190, 1195-96 (8th Cir. 2014) (holding the claimant's ability to perform light housework, wash dishes, handle money, leave her house, shop for groceries, watch TV, attend church, and visit family undermined her assertion of total disability).

Because "the ALJ [was] in a better position to evaluate" Edwards's credibility, the court "will defer to her determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." *Andrews v. Colvin*, 791 F.3d 923, 929 (8th Cir. 2015). Although the ALJ could have been more thorough in her reasoning for discounting Edwards's credibility, "a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the

case.' " *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (alteration in original) (internal citations omitted). Even though this court may have decided this case differently, the court finds that the ALJ's determination that Edwards was not fully credible is supported by substantial evidence in the record. Thus, the court finds the ALJ did not err in her credibility determination.

**B.    More Restricted RFC**

Lastly, Edwards argues the ALJ should have issued a more restricted RFC that included the use of two handheld assistive devices and the need to frequently change positions. Docket 17 at 38. As discussed above, the ALJ did take into consideration Edwards's use of assistive devices and her complaints of pain. Edwards fails to recognize that the ALJ's decision regarding her RFC was influenced by the ALJ's decision that her limitations (need to change position) were disproportionate to the medical evidence in the record. *See Wildman*, 596 F.3d at 964; *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).

Edwards contends that if the ALJ would have included those limitations, it would have "seriously erode[d] sedentary work." Docket 17 at 38. Edwards cites a social security ruling addressing an RFC assessment for less than a full range of sedentary work. *Id.* at 38-39 (citing SSR 96-9p; 1996 WL 374185, at *1 (July 2, 1996)). "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the

circumstances for which it is needed . . . ." SSR 96-9p, 1996 WL 374185, at 7.

The Eighth Circuit has not addressed what precise documentation a claimant must provide to establish the limitation of a medically required hand-held assistive device. In non-precedential decisions, the Third, Seventh, and Tenth Circuits have required an unambiguous opinion from a physician stating the circumstances in which the assistive device is medically necessary. *See, e.g.*, *Tripp v. Astrue*, 489 F. App'x 951, 954 (7th Cir. 2012) (finding the treating physician's statement that the claimant "does need a crutch" lacked the specificity to establish whether the crutch was a medical necessity); *Staples v. Astrue*, 329 F. App'x 189, 191-92 (10th Cir. 2009) (finding the treating physician's statement that the claimant "still uses a cane to walk" as insufficient to establish medical necessity); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (finding the evidence did not establish the claimant's cane was medically necessary when the treating physician provided a "script" for a cane and checked boxes for "hand-held assistive device medically required for ambulation" in a report).

The Eighth Circuit has noted the difference between a physician-prescribed assistive device and a claimant's self-adopted assistive device. *See Toland v. Colvin*, 761 F.3d 931, 936 (8th Cir. 2014). In *Toland*, the Eighth Circuit held that neither the treating physician's treatment notes nor other medical evidence in the record provided a medical justification for including a medically required hand-held assistive device in the claimant's RFC. *Id.* at 936.

The court considered the fact that there was no evidence in the record that any physician prescribed the claimant a cane or other assistive device for walking. *Id.* The court acknowledged the fact that the claimant admitted the cane was not prescribed by doctor. *Id.*

Here, the ALJ properly considered and weighed the available medical evidence and Edwards's testimony in the ALJ's RFC determination. The record lacks any medical documentation establishing the need of Edwards's assistive devices to aid in walking or standing or a description of the circumstances for which it is needed. The record contains numerous references to Edwards's use of crutches, canes, and walkers. But all of these mentions are traceable to Edwards's self-reports and to physicians' observations that she presented with an assistive device.

Edwards referenced three appointments/consultations contained in the record. Docket 17 at 38 (citing AR 500, 501, 495, 475, 469, 462). Edwards does "utilize[] canes or 'forearm crutches' to assist in ambulation and prevent[] falls.' " *Id.* But that does not meet the standard laid out in Social Security Ruling 96-9p. A physician's observation of a patient's use of an assistive device does not equate to medical documentation that establishes the need for the device and a description of the circumstances for which it is needed.

At pages 500-501 of the record, Dr. Fox observed Edwards's use of the devices during his physical examination. AR 500. He referred Edwards to physical therapy for a replacement crutch but only after he stated Edwards's primary physician, Dr. Becker, did not request a replacement crutch for

Edwards and Edwards stated she used crutches for the last six years. AR 501; *see* AR 495 (physical therapy consultation request). Dr. Fox did not provide a description of when Edwards was to use the crutches. AR 500-01. At pages 471-475 of the record, Dr. Becker noted Edwards's complaint of recent falls. AR 472. At that time, Dr. Becker did not mention any use of assistive devices or a recommendation for such use. *See* AR 471-75. Instead, a nurse at the appointment referred Edwards to physical therapy for the issuance of a walker after Edwards complained of a fall. AR 479; *see* AR 469 (physical therapy consultation request). Lastly, at page 462 of the record, Dr. Weisensee, a neurologist, observed Edwards's use of the assistive devices in her physical examination and history of present illness. AR 462-63. Thus, the lack of medical documentation establishing the need for such devices supports the ALJ's decision to not include this limitation in her RFC determination.

Additionally, in light of the Eighth Circuit's decision noting the difference between a prescribed and self-adopted use of an assistive device, Edwards failed to present medical evidence that showed the assistive devices were prescribed. At the hearing and in her brief, Edwards stated the devices were prescribed. AR 41; Docket 17 at 38. Edwards provides two citations to the record to support her position that her crutches were prescribed. Docket 17 at 38 (citing AR 469, 495). The cited medical records are referrals to physical therapy for the issuance of some assistive devices, not prescriptions. The first referral was by Dr. Fox on October 8, 2010, and was for a replacement of a missing crutch. AR 501. The second referral was by a nurse during a primary

care appointment for a walker after Edwards complained of falling. AR 469; *see* AR 479 (nurse's note). But after reviewing the medical notes, the court cannot say that the ALJ erred in not finding those notes were in fact prescriptions for the assistive devices.

The record also does not contain Edwards's original prescription. At her October 8, 2010 consultation with Dr. Fox, Edwards told Dr. Fox she had been using forearm crutches for the last six years. AR 500. The record does not contain any medical evidence from 2004 to confirm the reason for Edwards's initial use of forearm crutches. Additionally, the court examined all medical records dating back to April 8, 2009 (AR 651-52). In these medical notes, Edwards's use of assistive devices is observed. But her use during that time does not provide any basis for which this court can reverse the ALJ's decision not to include assistive devices as a limitation.

Overall, substantial evidence in the record supports the ALJ's implicit determination that Edwards's RFC should not include the limitation of medically required hand-held assistive devices. *See Tripp*, 489 F. App'x at 954. The record lacks any medical documentation that establishes the need for a hand-held device to aid in walking or standing and describes the circumstances for which it is needed. The record only contains medical evidence of the doctors' observations of Edwards's use of such devices. In other words, while Edwards's knees and hip pains are well-documented, there is no evidence that her use of the assistive devices is "medically required," as opposed to independently adopted by Edwards. *See Richmond v. Berryhill*, No.

16-CV-140-LRR, 2017 WL 4074633, at *3 (N.D. Iowa Sept. 14, 2017). Thus, the ALJ's exclusion of this limitation, and the limitation of Edwards's need to change position, was proper.

## CONCLUSION AND ORDER

The court finds that the ALJ's finding was supported by substantial evidence in the record as a whole. Thus,

IT IS ORDERED that the decision of the Commissioner is AFFIRMED.

DATED March 22, 2019.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE